May I proceed, Your Honors? Yes, Mr. Stewart. Thank you. My name is Lewis Miller. I represent Rod Stewart and his company. We're the appellanteer. There's a fundamental issue in this case, and it's something that's, frankly, I've never run across in all my years of law practice. There's a number of legal doctrines in issue. Law of the case, rule of mandate of a higher court with respect to a lower court, surprise, and so forth. But what we have here is most unusual in my experience and in my research. From day one in the pleadings of this case, the issue was lawsuit filed by Rio claiming breach of a signed written contract and a signed amendment to the contract. We denied there was a breach. We were the defendant. And we litigated on that basis throughout the case. There were multiple summary judgment orders, motions and orders. Magistrate made a ruling. The district court made an earlier ruling, which came up to this court and then went back. The issue of mutuality of contract, meeting of the minds, never came up in this case until at the end of the trial when the district court interjected the issue and gave the jury the third choice. I call it the third verdict. I was completely flabbergasted. I was totally surprised. In six days before the trial, both sides had made additional motions for summary judgment. The district court rendered an order denying in part and granting in part the motions and said point blank, and I'm looking at page 289 of the record, the party's differing interpretations of the contractual agreement between them serve as the basis for this dispute and the present lawsuit. That's the case I tried. In that same order, later on, the court dismissed the plaintiff Rio's quasi-contract claims on the grounds, this is at 308, said it is well settled that there's no equitable basis for an implied in law promise quasi-contract when the parties have an actual agreement between them. That's the case I tried. Until at the very end, the day before the closing argument, the court came up with this third verdict form that said there was no enforceable agreement essentially because there was no meeting of the minds. I did object. I was just confused about that. There was a letter in the record where you were submitting, I believe, a jury verdict form, and one of them asked the question, did Rio and the Stewart defendants enter into a contract for the second concert? Was that not raising the issue of did a contract exist? No. No. That was not raising the issue, and that verdict form was, that letter and the draft that went back and forth, I didn't submit it. My colleagues submitted it. It was never adopted. It was never addressed. We never, I never raised that issue in this case. If I had, if this issue had come up, Your Honors, I would have moved for judgment on the pleadings very early on, and I would have won because the Rio pleaded the existence of a contract. We admitted it in our answer. It's all right in the record at page 07. The odd thing, though, there are a couple of suggestions. Rio did tender some jury instructions at the final pretrial conference that would seem to raise the issue. Whether or not sufficiently or not, I don't know, but at least the issue had been interjected at that point. There was one boilerplate jury instruction that said, raised, just asked the question, was there a contract? It seemed to me it was very obvious there was a contract. It was not an issue that there was a contract. So I didn't really make an issue of something like that until the judge did not, he granted our Rule 50 motion for judgment with respect to the mutual mistake reformation, and then the next day he came back and he said, but that doesn't eliminate the mutuality of consent. That's when I realized there was an issue. That's the first time in this trial, in this entire case, all the years this case has been pending, and at pages 622 and 626 at seek, I objected as strongly as I didn't want to get in the district judge's face about it and go on more than I thought was appropriate, but I said point blank, it's not in the pleadings, it's not in the pretrial conference order, it's not the case that we have been preparing and doing discovery on and trying, and I would have done everything totally differently. I would have moved for judgment on the pleadings. I would have moved for summary judgment. I would have won all those issues, because there was a contract. I mean... Were you objecting before the court to the verdict forms, to the jury instructions, to both? And if both, why then later did you say you had no objection to the general verdict form? Okay. What happened was I objected to both. At 626 at seek, it's in volume three. At 626, the court said, the court's inclination is to instruct on bilateral mistake and add a fifth verdict form. And then I said, thank you, Your Honor, I don't think there's any basis for lack of mutuality. In other words, lack of a contract. I don't think there's any basis. It wasn't pleaded. In the next page. And then I'm talking about the jury instructions. At the end of line three, it says they did not mutually, this is at 627, it says they did not mutually consent to the same material terms. And then you go down to the bottom lines 15 and 16, the amendment is not a valid contract. And then on to the next page, 628, this is me talking. I think what this is saying, if I read it correctly, is there was no mutuality of contract. There was no agreement reached. Not that there was a mistake, but that the parties just never got together and had a meeting of the minds. That's how I read this. If that's the case, next paragraph, top of 628, if that's the case, I object. I don't think that's supported by the evidence in the case. We have signed written contracts. The parties acted on the contracts. They partially performed the contracts, so forth and so on. There was never any pleading or any reference in the pretrial conference to a lack of mutual assent or a failure to have a meeting of the minds. So I would respectfully suggest that we not use this basis in the record. So that's to the jury instructions. I said this. We were talking about the verdict forms, too. I made the same speech about the verdict form. I said it at 622, and we were talking at 626 through 628. We were talking about both. And then I'm looking, I guess, at the supplemental executive record, but it's page 2009, I guess, of the reporter's transcript, where you say, we have no objection to the general verdict forms that the Court has prepared, which did include the language about... Okay. Okay. I made my record. You know, we were rushing through the trial, and we were ‑‑ the judge was generous about letting us make our record, but we couldn't always make it when we wanted to, and we had to wait for the jury to come back. I made my record at 626 about ‑‑ and 628 in that same passage about the instruction. By that time, he had made his ruling. I'm not, as I said before, I'm not ‑‑ it's not my habit to get in a district judge's face over and over and over again. He made his ruling. I didn't actually ‑‑ we didn't actually see the verdict forms until after the closing argument, and the judge acknowledged that in here, that he hadn't had a chance to show them to us. So I felt that I had more than made my record with respect to the instruction, the legal issue, and the verdict form, and I never waived this issue at all. I think we more than preserved it. But, no, I didn't do it repeatedly. I acknowledge that. On appeal, are you continuing to challenge both the jury instructions and the verdict form? Yes, but principally, I'm really challenging ‑‑ I should say, I'm really challenging the verdict form. I made my objection to the jury instruction, but the focus of this appeal is the verdict form. The jury should not have been given the third choice. This case was defined from day one, from the pleadings, from this court's prior mandate. The parties have an integrated contract. That was this court's ruling before. There was an integrated contract, the amendment and the initial millennium contract. You are now to go back. The mandate was go back and take the extrinsic evidence, and the trier of fact will evaluate and determine the credibility of the extrinsic evidence. And that's the case we litigated through motions, pretrial conference proceedings, subsequent motions, and limiting motions in two weeks of trial, until right at the end, this issue came up. And I felt that I more than made my record in a respectful way. And that's really ‑‑ if a party had tried this ‑‑ I mean, I feel in a sense, and I say this respectfully, I feel ambushed by the court. If a party had tried this, I don't believe most courts would permit it. I think a district judge would say, I'm sorry, that's just not part of the case. That's what we have pretrial conference orders about. That's what we have pleadings about. That's what we have the rules of civil procedure about. You've got to raise it. We have to make it clear. At the end ‑‑ Did you ever respectfully point out to the court that the mandate of the Ninth Circuit is pretty clearly written, that the question to be resolved is whether it was paragraph D17 or D18 that the parties incorporated, and that what the court was doing was contrary to the mandate of the Court of Appeals? I made a motion in limine to enforce the mandate of the Court of Appeal based on the law of the case. The motion was granted. I thought I was on pretty solid grounds. I specifically made a motion in limine on that basis. I won the motion. I figured, you know, we're trying the case that the Ninth Circuit sent back. Yes, Your Honor, I did. I did not see any of this coming until right at the end. I had absolutely no notice. And I take it, though, that because of the fact that you've won the motion in limine, you didn't remind the trial judge at pages 622, 626 to 28, excuse me, Your Honor, but that's not what the Ninth Circuit told you to do here. I said what I said. You know, I thought I raised the issue, and I was ‑‑ I mean, I know hindsight is 20-20, and I'm not criticizing. I'm just asking whether or not you thought to remind the court that the panel had told him to do something more narrow than apparently what he did. I'll say it for the third or fourth time. I didn't want to get in the judge's face any more than I already was. I won my in limine motion. I won in the Ninth Circuit. We came back for the taking of the extrinsic testimony, extrinsic evidence. The jury was hearing the contract negotiators. Everything I thought went fine. Everything went great. I thought we were on track. I frankly thought we were going to prevail in the case. And then this came up. And quite frankly, I think what happened is that the jury took the easy way out, was given a very easy way out, and took the easy way out, did not have to resolve the issue of whether this contract negotiator's testimony was credible or the other side's negotiator was credible. So they took the easy way out. I think that was error as a matter of law, de novo review, didn't follow the mandate, totally caught me by surprise. This is not ‑‑ I looked up the law of this circuit on surprise. This is a case that falls squarely under the holding in the ‑‑ and we cited this consolidated data terminals case. Pleadings can be amended, but not if it causes substantial prejudice to the opposing party. It's in our brief. It's a 1983 Ninth Circuit case. I mean, the prejudice is palpable. I would have litigated the case entirely differently, and I wouldn't be standing up here before your honors. I would have had in the bag my motion for judgment on the pleadings or for summary judgment on the issue of contract formation. I never would have tried that issue. Our contract was heavily negotiated. D17 and D18 were negotiated between the contract negotiators. Drafts went back and forth. There was no failure of a meeting of the minds. It's a question of which clause applies. And that's the case ‑‑ It's not the same thing, though. I mean, as I read our prior decision, what we were remanding for was a trial in order to permit a jury to decide which of the two clauses the parties had agreed upon. That is a contract formation issue. No, it's not. It makes sense, is it not? No, it's not, Your Honor. They agreed on both clauses. The testimony is undisputed that both clauses ‑‑ our position was that D17, the refund for illness, only applied to the Millennium Concert, because that was a unique, once‑in‑a‑lifetime type event, and that the D18, the force majeure clause, applied to the Second Concert. Their position was just the opposite. Both clauses were agreed to. It was a question of how they were to be interpreted with respect to the Second Concert. So the trial was to admit extrinsic evidence in order to answer that question. That's exactly right. That's exactly right. And that was the mandate of this court. That was the case ‑‑ I feel like a broken record a little bit here. That was the case we tried. We litigated and tried. And I don't like going back and forth. This is the second time we've been up to the Ninth Circuit. I mean, there's got to be finality at some point in time, but more importantly, there's got to be fairness. And there wasn't fairness to me and to my client when we walked into that courtroom and we got that third verdict for him. We should not have had to deal with that. Thank you, counsel. Thank you very much, Your Honors. Mr. Miller makes a couple of points, one of which he didn't repeat to you here in the courtroom. I was preceded by the word flabbergasted. He said he was flabbergasted when he heard that this theory of contract formation was pulled out from under the judge's robe like a rabbit from a magician's hat, and he was astonished by that. That's what he just told you. I was flabbergasted. In his brief, he describes this as the judge having pulled this out from under his robe on the last possible day like a rabbit from a magician's hat. That isn't what happened here at all, and that isn't the history of this litigation going back as far as the panel's decision in Rio One. And here it is, if you'll indulge me for a moment, because it's important. It has to do with what it is Mr. Miller and Roderick Stewart and Barry Tyerman thought it is they were doing. And here is the way it goes. It starts with our complaint. We ask for in our complaint, both the original and First Amendment, we ask for a refund under the express refund provision of the contract. We thought those expressed refund provisions were paragraph two of the amendment and D-18 of the original contract, and we ask for relief in equity. We ask for our money back. This was not a case of suit for damages. All we wanted was our money back for a non-performance by the person to whom we gave it. In the answer to the complaint, this is Mr. Miller's answer. It isn't mine. He claimed in his answer, in a long narrative answer, or an answer that we have a right to reschedule. It is our contract right to reschedule. And he claimed that under paragraph D-17, which was one of the paragraphs that Rio One discussed and said we need to send this back to the court and have a trial on what these two paragraphs, D-17 and D-18, mean and what the parties intended them to mean. They didn't send this back, with an instruction, a remand to try this in accordance with our opinion, and our opinion is all we're going to do is take testimony on D-17 and D-18, and then we'll flip a coin to see whose interpretation is correct. They said we're going to send this case back for a trier of fact to determine what the parties' intentions were. And in the answer I just mentioned to you, that was on file, when that motion was heard, one of the things that was pled as the 17th affirmative defense was uncertainty. We are uncertain about the contract that is alleged as the basis for the restitution that Rio's thing, seeks. The prior summary judgment, he could not have been flabbergasted. The prior summary judgment that this court reversed had these two points in it, in both the principle brief and in the reply brief. And you can find these in the supplemental excerpts of record, not his, ours, at 002 and 0024. And what we alleged in that motion was this, and I'm quoting, Stewart seeks to impose on Rio, Stewart seeks to impose a new contract on Rio, one to which it did not assent. And then we went through discovery, when this case came back from the circuit previously, we went through discovery. The principal negotiators of this contract were deposed, Mark Freitos, Scott Bogatz, Barry Tyerman, and here's what Rio's witnesses said in deposition and what they said at trial. We never agreed to. We never agreed to the application of D-17 to the second concert and the omission of D-18. We never agreed to a right to reschedule if the artist didn't show up for illness, which was D-18. If the artist didn't show up, he got the money back. I examined Barry Tyerman after some frustrating efforts to get him to come to a deposition, and while I was there, he was sending the documents that he should have produced to me at his deposition in Los Angeles by fax to my office in Las Vegas, but nevertheless, we got through his deposition. And I asked him. I asked him questions about what it was he intended, what he disclosed, and what he understood D-17 and D-18 to mean and who he dealt with when he had those conversations. And it was principally Mark Freitos. These people all came to trial and testified. And Mark Freitos testified. Scott Bogas followed him. These were real contract negotiators. And they said unequivocally, unequivocally, that they did not intend or understand D-18 to be omitted from the second concert. And Mr. Miller cross-examined him on that. And then the day after he started his cross-examination, he had a thought. And he expressed it to the judge. He said, you know, this has been a lot of testimony here that has come in. I'd like to have a standing retroactive objection to all of it so I don't have to keep standing up and, to use his expression, give in your face, Your Honor. And the judge said, Mr. Miller, it is your obligation to object when you have an appropriate objection to preserve your record. The court can't do that for you. And it's not fair to ask the court to do that by asking for a standing objection so we can say after everything is over, well, the objective to everything and have nothing to go on. He called Barry Tireman. And he examined Barry Tireman. There was a colloquy between the court and Mr. Miller. And it ran over a day. He wanted to ask Tireman some questions about contract formation. And we were concerned that the manner in which he was phrasing his questions would contradict a specific portion of paragraph two. And so we made those objections known to the trial judge. And the trial judge thought about it. And he came back and he said, I'm going to let you examine Mr. Tireman on, in essence, these are my words now, contract formation. But I'm going to give under a limiting instruction. I'm not going to let him testify to a point that contradicts the expressed words in paragraph two. Mr. Miller said he understood that instruction. Called the witness out of order and went back to Mr. Tireman and examined him thoroughly. And I examined him thoroughly too. And you know what we found out in the examination of Mr. Tireman when we compared it to Mr. Traitos and Mr. Bogatz? That neither one of them disclosed to the other with respect to the negotiations of the second contract what he believed was being incorporated or dropped out of the contract or not. And that's where we came to mistake. And if it was inartfully expressed or perhaps described as a failure of mutual assent, it's unfortunate, but it means this. The parties, when they reached an agreement on the second concert, did not have in mind and did not intend the same consequences from their, on their agreement with respect to a material term. And that material term turned out to be rescheduling for artist illness. And neither said to the other that this is my understanding or tell me so I can agree or disagree. They had already a year before agreed that if the artist was ill and could not sing for the millions of dollars he was being paid, he would give it back. That's D-18. There isn't a rescheduling clause in that. But there is in D-17 and that's why he's so passionate about it. The force majeure. We'd like to read out of the party's negotiations what they agreed on, D-18, and only stay with D-17. With D-18 up, it's our case. Now Mr. Miller says as we proceeded along on this assumption that D-17 was in, D-18 is out, we were terribly surprised by the judge when he drove. Well here's what we did in August preceding the trial. We filed a pretrial order. And in connection with that pretrial order we tendered jury instructions. And one of our jury instructions that we tendered was lack of mutual assent. No contract formation. The pretrial order though, as it was filed, doesn't have that issue in there, does it? It doesn't have that issue in it expressly, but it is under that pretrial order and in connection with the equitable claims we're making, they are discussed in the pretrial order, that we included the jury instructions which in point of fact do address that point. And those jury instructions carried forward, I might add, are based on California law. In particular, instruction 30. That's the mistake instruction that's being discussed here. That is based on a California forum jury instruction. And we tendered that instruction. You can find them at Supplemental Excerpts of Record. Again, those weren't put in by the appellant from pages 133 to 137. So why doesn't the pretrial order then control the scope of the trial under, for example, Southern California Retail Clerks Union? Because in point of fact, it was in effect amended. The jury instructions gave fair notice under the pretrial order. The parties proceeded to elicit evidence consonant with, and that includes Mr. Miller, consonant with the jury instructions that had been tendered that hadn't been adopted yet. But that information was available and over objection from time to time, the testimony continued uninterrupted that addressed contract formation from both sides. Now, I don't see how, given this history, it's fair to say, and I point out in the Reimer and in the transponder, transpower cases that we tendered to you, and I, and I, and I admit we've covered this in our brief also in 1951, but we tended some supplemental authorities that say the jury instructions do. They do give appropriate notice under a pretrial order. Jury instructions tendered with the pretrial order, that's the transpower case, expressly says that's adequate notice. But more importantly, your honors, as you listen to this argument and you read it in the briefs, I have to sum up now. Here's what's missing. Mr. Miller told you a few minutes ago, if I just had known what was going to happen, I'd have tried my whole case differently. I was blindsided. I feel like the judge put one over on me. Well, you know, he never said a word about any of that. He didn't say I was flabbergasted to the judge. He didn't say I'm surprised. He didn't say I would have done anything differently. He didn't ask for a continuance to obtain new evidence or to call a different witness. He didn't ask to recall Mr. Tyerman, the negotiator. Who had already been examined on the point of contract formation. Without objection by Mr. Miller, he examined him on that issue. Now, when we get down to the end of it, and as the judge pointed out, you know, we all know a lot more about this case now than we did when Rio won. The panel sent it back to us because we've had some discovery. We've looked at some evidence. And it appears to me, ladies and gentlemen, he's speaking to all of us, that each side has got a point here, but each side is contending for a different contract. So this is what I'm going to do. I'm going to give, consistent with the evidence, three instructions or three verdict forms. One, and I will instruct the jury accordingly, you can find in favor of Stewart, if Mr. Miller is correct. We never intended to agree to D-18 for the second concert. It's an instruction. It's a verdict form for him. The jury didn't buy it. He submitted an instruction and a verdict form for Rio. For express breach of contract. Jury didn't buy that either. And he gave him a third, he gave him a third alternative. Based on all of the evidence that had come in and what he heard, and that alternative was, did these parties ever agree on the same thing and thereby form a contract? And the jury came back and said, no. No post-trial motions followed that. No uniform motion. In point of fact, Mr. Miller, he quoted to you from some of the records that he read from. Read this carefully, 599 over to 600, and you will see there's a relative pronoun that's used when he closes his remarks on his objection to instruction 30. It's called that. And he says, I am, I oppose this instruction because there isn't sufficient evidence in the record to support it. And with that, I conclude my remarks, your honor. That's my basis. And he didn't file a Rule 50B motion. He didn't file a Rule 59 motion. Didn't file any motion at all. He just came up here and today gets to tell you for the first time, when he didn't tell anybody else, I was flabbergasted, your honors. And if I had been, if I had known what I was getting into at the end of the course that ended at trial in September of 2005, I would have done something differently. I'm sorry you've indulged me and I'm at the end of my time. Thank you for your attention. We, uh, we allowed your opponent to go over a minute 20 so you can have a minute 20 for a very good rule. Thank you both for your presentation. The matter is submitted and we are in recess for the morning. All rise. This court for this session stands adjourned.
judges: Thomas, Tallman, Ikuta